## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLIANCE HOLDINGS, INC.; BARBIE SPEAR, in her capacity as Trustee of the Alliance Holdings, Inc. Employee Stock Ownership Plan; and AH TRANSITION CORP.; <br><br> *Plaintiffs,* <br><br> *v.* <br><br> SQUIRE PATTON BOGGS (US) LLP; <br><br> *Defendant.* | **JURY TRIAL DEMANDED** <br><br><br><br> Civil Action No. _____ |

## COMPLAINT

Plaintiffs Alliance Holdings, Inc. ("Alliance"); Barbie Spear, not in her individual capacity but solely in her capacity as Trustee of the Alliance Holdings, Inc. Employee Stock Ownership Plan ("Alliance ESOP" or the "ESOP"); and AH Transition Corp. ("AH Transition") (collectively "the Alliance Entities"); for their claims and causes of action against defendant Squire Patton Boggs (US) LLP (as successor in interest to Squire Sanders (US) LLP, and referred to herein as "Squire Sanders" for sake of historical accuracy), allege and aver as follows:

## INTRODUCTION

The attorney-client relationship is a special affiliation, imbued with fiduciary obligations owed by the attorney to the client. It carries with it the trust that confidences will not be shared, the understanding that the attorney owes the client an undivided loyalty, and the assurance that the attorney will seek to protect the client's best interests. Squire Sanders, a 1500-lawyer, well-known international law firm violated these most sacred duties, choosing instead to follow and advance the whims and greed of Alliance's founder David Fenkell rather than protect the interest

of the Alliance entities and the interests of the Alliance ESOP's thousands of innocent participants.

Squire Sanders turned a blind eye to both the substance and the formalities of the ethical rules it is bound to follow. It neglected to define the scope or limitations of its services in engagement letters. It simultaneously represented Alliance and other clients whose interests conflicted. It failed to secure consents or waivers of its conflicting representations and those it did secure were defective, signed by precisely the individuals whose conflicting interests were at issue. It both designed and advised with respect to the Alliance ESOP, assisted Fenkell in exploiting the ESOP, and placed two of its partners on the Alliance Compensation Committee to ensure that Fenkell would be highly paid (and his failings buried) so that Squire would continue to receive a flow of Alliance and ESOP business.

By the time its misconduct was discovered in the fall of 2012, Squire Sanders had progressed from assisting Fenkell and Fenkell's associates in covertly diverting tens of millions of Alliance dollars to themselves out of the proceeds of Alliance and or ESOP transactions to stooping to conspiring with Fenkell to steal Alliance money and pay its own partner, Paul Sefcovic hundreds of thousands of dollars. As a grand finale, as Fenkell's schemes began to unravel, Squire Sanders drafted a new Employment Agreement for Fenkell and then an amendment to that Employment Agreement, granting Fenkell obscene severance pay under broad and biased termination provisions, and indemnifying Fenkell and his wife for breaches of fiduciary duties that had already been adjudicated against him. The latter indemnification provisions were put into effect without the amendment ever being circulated to the Alliance Compensation Committee.

Squire Sanders' misconduct injured both Alliance and the Alliance ESOP, inflicting millions in damages.  In exchange for Squire Sanders' wrongful conduct and flexible approach to its ethical obligations, Alliance also paid dearly in legal fees, paying in excess of $7 million over the course of the lengthy representation.

## JURISDICTION AND VENUE

1.      The Alliance entities raise both state and federal claims in this lawsuit.   The state-law claims relate to Squire Sanders' legal malpractice in connection with its representation of Alliance corporate entities.  The federal claims arise under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and specifically sections 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), and address Squire Sanders' knowing participation in Fenkell's ERISA violations and its own, independent breaches of fiduciary duty.

2.      For its state-law claims, specifically, Alliance brings this action for legal malpractice, breach of contract, aiding and abetting breach of fiduciary duty, fraud, aiding and abetting fraud, and civil conspiracy, to address the harm to Alliance by Squire Sanders when it aided and abetted, and knowingly participated in Fenkell's breach of his fiduciary duty owed to the Alliance entities and the  looting of Alliance by Fenkell and his cronies.

3.      This Court has supplemental jurisdiction over plaintiffs' state-law claims pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

4.      ERISA applies because the services Squire Sanders provided to Alliance and the ESOP made it an ERISA service provider/party in interest.  *See* § 3(14)(B), 29 U.S.C. § 1002(14)(B) (defining "party in interest" as "a person providing services to [an employee benefit] plan"). Because (as set forth herein) Squire Sanders partners knowingly participated in Fenkell's breaches of fiduciary duty, Squire Sanders is jointly and severally liable for Fenkell's

breaches. *Harris Trust and Savings Bank, etc. v. Salomon Smith Barney,* 530 U.S. 238 (2000) (ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes suits against fiduciaries and non-fiduciary parties in interest who "knowing[ly] participat[e] in a fiduciary's violation" of ERISA § 406). In addition, because Alliance itself was a plan asset of the ESOP until mid-2011, Squire Sanders is independently liable to the ESOP as a breaching fiduciary to the extent it had control over ESOP assets (such as in setting Fenkell's compensation).

5.     This Court has original jurisdiction over this matter under 29 U.S.C. § 1132(e)(1), which gives the federal district courts exclusive jurisdiction over claims arising under ERISA.

6.     Venue is proper in this District under 28 U.S.C. § 1391, because plaintiffs have suffered substantial injuries in this District. Venue is also proper in this District under 29 U.S.C. § 1132(e)(2), because at all times relevant to this Complaint the Alliance ESOP was administered in this District.

### PARTIES

*Alliance*

7.     Plaintiff Alliance is a Pennsylvania corporation with its principal place of business in Abington, Pennsylvania.

8.     Alliance is essentially a holding company that invests in mature and profitable manufacturing and specialty finance companies with stable operating results, proven earnings history, and sustainable cash flows.

9.     Alliance has been the sponsor, Plan Administrator, and a named fiduciary of the Alliance ESOP since the Alliance ESOP was formed in 1995.

10.     When Alliance acquires a company, the employees thereof become participants in the Alliance ESOP.

11.     As a result of its structure, Alliance is 100% employee-owned.

4

12.     Generally, Alliance's business plan is to eventually divest itself of the companies it acquires or in which it otherwise invests after sufficiently increasing their value.

13.     Squire Sanders represented Alliance in connection with many acquisitions, divestitures, and other investments, including Accord Industries, Alexander Marketing Services, Beacon Management Group, Computer Methods Corporation, Design Tanks, Lazy Days R.V. Center, NorthStar Capital Market Services ("NCMS"), Panhandle-Plains, Paradise Marine of Melbourne, The Sharon Companies, Spectral Response, Spencer Turbine Co., and Trachte Building Systems ("Trachte").

14.     From 1995 up to and including at least August 2011, Alliance was not an operating company within the meaning of 29 C.F.R. § 2510.3-101(c) because (1) it was not primarily engaged in the production of goods or services other than the investment of capital, (2) it was not a venture capital operating company, and (3) it was not a real estate operating company.

15.     From 1995 through at least August 2011, Alliance was primarily engaged not in the production or sale of a product or service, but in the investment of capital through the purchase of participation interests in investment-receivable portfolios.

16.     Up to and including at least August 2011, Alliance had less than 50% of its assets, valued at cost, invested in the production or sale of a product or service.  Specifically at year end:

      a.     in 1995, Alliance had 1.70% of its assets, valued at cost, invested in the production or sale of a product or service;

      b.     in 1996, Alliance had 0.13% of its assets, valued at cost, invested in the production or sale of a product or service;

c.     in 1997, Alliance had 8.10% of its assets, valued at cost, invested in the production or sale of a product or service;

d.     in 1998, Alliance had 8.10% of its assets, valued at cost, invested in the production or sale of a product or service;

e.     in 1999, Alliance had 8.10% of its assets, valued at cost, invested in the production or sale of a product or service;

f.     in 2000, Alliance had 8.10% of its assets, valued at cost, invested in the production or sale of a product or service;

g.     in 2001, Alliance had 8.10% of its assets, valued at cost, invested in the production or sale of a product or service;

h.     in 2002, Alliance had 10.43% of its assets, valued at cost, invested in the production or sale of a product or service;

i.     in 2003, Alliance had 5.43% of its assets, valued at cost, invested in the production or sale of a product or service;

j.     in 2004, Alliance had 5.89% of its assets, valued at cost, invested in the production or sale of a product or service;

k.     in 2005, Alliance had 9.20% of its assets, invested in at cost, from the production or sale of a product or service;

l.     in 2006, Alliance had 10.84% of its assets, valued at cost, invested in the production or sale of a product or service;

m.     in 2007, Alliance had 9.53% of its assets, valued at cost, invested in the production or sale of a product or service;

n.   in 2008, Alliance had 3.73% of its assets, valued at cost, invested in the production or sale of a product or service;

o.   in 2009, Alliance had 10.09% of its assets, valued at cost, invested in the production or sale of a product or service; and

p.   in 2010, Alliance had 25.82% of its assets, valued at cost, invested in the production or sale of a product or service.

17.   At all times through at least up to and including August 2011, Alliance never had 50% of its assets, valued at cost, invested in venture capital investments (investments in an operating company where the investor has or obtains management rights) as defined in 29 C.F.R. § 2510.3-101(d)(3)(i).  Nor has Alliance ever held itself out to be a venture capital operating company ("VCOC") pursuant to 29 C.F.R. § 2510.3-101(d).

18.   Therefore, from 1995 up to and including at least August 2011, Alliance was not a VCOC as that term is defined in 29 C.F.R. § 2510.3-101(d)(1), *i.e.*, it has never been an entity that (i) had at least 50% of its assets (other than short term investments pending long-term commitment or distribution to investors), valued at cost, invested in venture capital investments, and (ii) in the ordinary course of its business, actually exercised "management rights" with respect to one or more of the operating companies in which it invested.

19.   Alliance has participated in some transactions with Brookdale Living Communities, Inc. ("Brookdale"), a publicly-traded company that develops and manages senior care/assisted living facilities.  However, Alliance has never been a "real estate operating company" as that term is defined in 29 C.F.R. § 2510.3-101(e), since it has never had 50% of its assets valued at cost invested in real estate and has not, in the ordinary course of its business, engaged directly in real estate management or development activities.

20.     Alliance has never been an investment company registered under the Investment Company Act of 1940.

21.     For the reasons stated herein, from December 1, 1995 through at least August 2011, Alliance's assets were assets of the Alliance ESOP for purposes of ERISA, or "plan assets," as that term is defined in ERISA § 3(42), 29 U.S.C. § 1002(42), and in 29 C.F.R. § 2510.3-101.

*The Alliance ESOP*

22.     The Alliance ESOP is an employee benefit plan and a defined contribution pension plan for employees of Alliance and its subsidiaries, within the meaning of ERISA sections 3(2) and 3(3).

23.     With the assistance of Squire Sanders, Fenkell formed the Alliance ESOP effective December 1, 1995.  Since that time Squire Sanders repeatedly provided advice to the ESOP's sole trustee (Fenkell) with respect to the ESOP's administration, investments, and decision-making.

24.     Fenkell served as sole Trustee of the Alliance ESOP since its formation until July 2, 2012.

25.     Spear has been the sole Trustee of the Alliance ESOP since July 2, 2012.

26.     From December 1995 until September 1, 2005, the Alliance ESOP owned all or substantially all of Alliance's outstanding common stock.  Since September 1, 2005, the Alliance ESOP has owned approximately 60% of Alliance's common stock, with AH Transition (wholly-owned by the Alliance ESOP) owning the rest.

*AH Transition Corp.*

27.     AH Transition is a wholly-owned subsidiary of the Alliance ESOP.

28.     Since September 1, 2005, approximately 40% of Alliance's common stock has been held by AH Transition.

***Squire Sanders***

29.     Squire Patton Boggs (US) LLP is an Ohio limited liability partnership with its principal place of business in Cleveland, Ohio.  Squire Sanders employs approximately 1500 lawyers who provide services to clients throughout the United States and the world.  It presently has attorneys in 44 offices in 21 countries throughout the world, and annual revenues of approximately $1 billion.

30.     Squire Sanders conducts business in the Commonwealth of Pennsylvania, including providing services to Alliance at all times relevant hereto.

31.     Squire Sanders is responsible for the conduct of its partners and other attorneys and the financial consequences thereof.

## FACTS

***Squire Sanders' Representation Of Alliance, In General***

32.     Squire Sanders has represented Alliance continuously since at least 1994, when Fenkell retained Squire Sanders to help establish Alliance, including preparing the Alliance Articles of Incorporation and bylaws, and then drafting all or parts of the Alliance ESOP's original plan documents the following year.

33.     There is no record of any engagement letter between Squire Sanders and Alliance, any Alliance affiliate, or the Alliance ESOP related to any matter at any time.  Squire Sanders has confirmed the absence of any record of any engagement letter.

34.     Since the mid-1990s, Squire Sanders has represented Alliance, its affiliated entities, and the Alliance ESOP in essentially every matter in which Alliance needed outside legal counsel,  including:  advising on corporate structure and corporate governance matters;

advising on ERISA legal issues and compliance, and maintaining the Alliance ESOP plan documents; representing Alliance on corporate transactions; advising on Alliance's incentive compensation programs; advising on Alliance's employment agreements, including Fenkell's; advising on the more than $500 million in loans from Banc One Capital Holdings Corporation and Banc One Capital Funding Corporation to the Alliance ESOP, and the Alliance Holdings ESOP Structured Finance Program, and representing Alliance in litigation.

35.     Other than a brief period between 2002 and 2004, Alliance has not employed any in-house lawyer.  Its only-ever General Counsel, David Cooper, was a former Squire Sanders attorney.

36.     Fenkell controlled the selection of counsel for Alliance and its affiliates.  Alliance and its affiliates almost never retained another law firm to provide legal services.

37.     The Alliance entities, including the Alliance ESOP, relied on the soundness of the legal advice provided by Squire Sanders, and on Squire Sanders' abiding by its ethical obligation to serve in the best interest of the entities, rather than furthering the interests of its founder David Fenkell to the detriment of the companies.

38.     Since the inception of the Squire Sanders' relationship with Alliance, Squire Sanders billed and collected from Alliance and its affiliates at least $7 million in legal fees.

39.     Squire Sanders lawyers Paul Sefcovic ("Sefcovic"), Carl Draucker ("Draucker"), Erik Rickard ("Rickard"), Michael Meissner ("Meissner"), and Donald Hughes ("Hughes") played the most significant roles in the Alliance/Squire Sanders relationship, although dozens of attorneys worked on Alliance matters over time.

40.     Sefcovic was a partner at Squire Sanders through at least some date in late 2012.

41.     Sefcovic was a close personal friend of Fenkell whose relationship with Fenkell predated the formation of Alliance.

42.     Sefcovic was Squire Sanders' "relationship partner" for Alliance, was responsible for coordinating the services Squire Sanders provided to Alliance, and was ultimately responsible for Squire Sanders' billing to Alliance.  His pay from the law firm was calculated in part based upon the revenue the firm derived from the Alliance representation.

43.     From 2002 until September 12, 2012, Sefcovic also served as a member of (and was Chairman of beginning in 2005) Alliance's Compensation Committee, and was at least in part responsible for setting or approving Fenkell's compensation.

44.     Lianne Sefcovic ("Lianne Sefcovic") is the wife of Sefcovic.

45.     Draucker is a Squire Sanders partner who focuses his practice on tax-qualified retirement plans, deferred compensation plans and executive compensation.  Draucker has rendered legal advice to Alliance and the Alliance ESOP since the inception of the relationship between Squire Sanders and Alliance.   For example, he reviewed the initial Alliance ESOP plan documents and thereafter advised sole trustee Fenkell concerning ESOP administration and investment issues.  Since the inception of the Alliance/Squire Sanders relationship, Draucker advised on ERISA issues, executive compensation issues, and many of Alliance's corporate transactions.  Draucker is an alumnus, trustee and secretary of Hiram College, and has caused Squire Sanders to perform legal work for Hiram College as well as for its for-profit affiliates.

46.     Rickard was a Squire Sanders partner who practiced in the areas of real estate and real estate finance.  Rickard represented Alliance in connection with the Brookdale transactions described herein, and represented DBF Consulting in Brookdale transactions as well.

47.     Hughes is a Squire Sanders partner who practices in the area of mergers and acquisitions, private equity, joint ventures, corporate finance, and corporate governance.  Hughes has rendered legal advice to Alliance and the Alliance ESOP on a number of issues, including the corporate governance of Alliance, executive compensation issues, corporate acquisitions, and the 2012 amendment to Fenkell's employment agreement.  Hughes drafted origination documents for one incarnation of Fenkell's personal side business, DBF Consulting, and he knew and understood, as did all the senior Squire Sanders attorneys, that DBF Consulting in all its incarnations, was an entity solely owned and controlled by Fenkell, the profits of which flowed solely to Fenkell.

***Fenkell And The Formation Of Alliance***

48.     Fenkell served as President and CEO of Alliance from its incorporation on December 7, 1994 through September 25, 2012.

49.     When Alliance was formed, Fenkell appointed himself as Alliance's sole director. Fenkell served as Alliance's sole director from December 7, 1994, through July 2, 2012, and was a member of Alliance's Board of Directors (the "Board") through September 25, 2012.

50.     On December 6, 1995, Fenkell signed a Board resolution appointing himself sole trustee of the Alliance ESOP.  Fenkell served as the sole Trustee of the Alliance ESOP from its inception until July 2, 2012.

51.     Alliance's bylaws provide that its Board has the authority to determine the number of directors.  Fenkell was the sole member of Alliance's Board from Alliance's founding until July 2, 2012.  On July 2, 2012, Fenkell caused two additional directors to be added to Alliance's Board.  These were Ken Wanko, a management employee of Alliance who reported directly to Fenkell, and Marty McCarthy, an accountant and personal friend of Fenkell who had done business with Fenkell and Alliance for many years.

52.    Pursuant to the Alliance ESOP's trust agreement, the power to remove a trustee lay only with the Alliance Board, which until July 2012 consisted of Fenkell alone.  The Alliance ESOP's trust agreement also provides that the Board has the power to change the number of trustees and to appoint additional trustees to fill vacancies caused by any such increase.  At no time while he was a director did Fenkell increase the number of Alliance ESOP trustees.

53.    Alliance's bylaws provide that directors are to be elected at annual shareholder meetings.  Pursuant to the Alliance ESOP trust agreement, all employer securities held by the Alliance ESOP are voted by its trustee.  Fenkell never voted the Alliance ESOP's shares to elect a director other than himself.  Although Alliance ESOP participants can direct the trustee as to how to vote the shares held in their accounts, the trustee has discretion to vote all unallocated shares.  There were never enough shares allocated to the Alliance ESOP participants' accounts for them to override a contrary vote of the unallocated shares by Fenkell.

54.    When Alliance was formed, Fenkell appointed himself Alliance's President.  Alliance's bylaws state that the President "shall hold office at the pleasure of the Board of Directors, or until death or resignation."  Fenkell served as Alliance's President from the Company's founding until he resigned the role on September 25, 2012.  Pursuant to Alliance's bylaws, as President, Fenkell was also Alliance's CEO.

55.    As Alliance's President, CEO, and sole Director, Fenkell had complete control over Alliance.

56.    As the Alliance ESOP's sole Trustee, Fenkell had complete control over the management and administration of the Alliance ESOP.

57.    This arrangement created a self-reinforcing system whereby Fenkell ensured he was both the sole Trustee of the Alliance ESOP and the sole director of Alliance for so long as

he chose to be, and at the same time prevented effective corporate oversight, the implementation of governance protections and independent monitoring of decisions made by Fenkell with respect to the ESOP.

58.    Squire Sanders also (1) provided legal advice to Fenkell, for his own benefit or the benefit of entities he personally owned and controlled; and (2) in concert with Fenkell may have caused Alliance to pay for this work by billing Alliance for the time spent working on matters for Fenkell personally.

59.    Squire Sanders represented Fenkell in matters adverse to Alliance's interests and to the interests of the Alliance ESOP.  Those conflicts were unwaivable.  If waivable, Alliance and the Alliance ESOP never consented to waive any conflict.  To the extent consent was sought on Alliance or the Alliance ESOP's behalf from Fenkell himself, his self-interest rendered him incapable of consenting on Alliance's or the Alliance ESOP's behalf.

60.    Fenkell's control over the Alliance entities allowed Squire Sanders to violate its duties and responsibilities to Alliance and the Alliance ESOP  in favor of Fenkell without being questioned, and without detection or interference by anyone else associated with Alliance or the Alliance ESOP.

61.    Squire Sanders advised Fenkell on how he could solidify and perpetuate his control over Alliance and the Alliance ESOP, and evade effective corporate governance oversight.

62.    Fenkell also perpetuated his iron grip on Alliance and the Alliance ESOP by firing and/or intimidating personnel who suspected or who could have detected his self-dealing.

63.    Although Squire Sanders had a duty to communicate fully and openly with its clients, Alliance and the Alliance ESOP, it instead communicated principally with Fenkell.

*Bank One And Stonehenge Transactions*

64.    Beginning in 1995, Fenkell caused the Alliance ESOP to take out loans from Bank One entities, including Banc One Capital Funding Corporation and Banc One Capital Holdings Corporation (collectively, "Bank One").

65.    A prior section of the Internal Revenue Code, section 133, allowed financial institutions that loaned money to ESOPs to exclude from taxable income 50% of the interest on such loans.

66.    Bank One shared its tax savings on the interest paid on these loans to the Alliance ESOP with the Alliance ESOP.

67.    The Alliance ESOP, at Fenkell's direction, used those proceeds to purchase Alliance stock from Alliance.  Alliance then made cash contributions to the Alliance ESOP sufficient to enable the ESOP to repay the interest on its loans from Bank One.  Alliance and/or its subsidiaries then used the funds from the Alliance ESOP's purchase of Alliance stock to purchase participation interests in investment-receivable portfolios from Banc One Financial Services, Inc. (the "Participation Interests").

68.    Because payments on the receivables exceeded what Alliance owed on the ESOP loans, it realized a profit, which all parties referred to as the "spread."

69.    The Participation Interests were held pursuant to a Receivables Participation Agreement between Alliance and Alliance-related entities and Banc One Financial Services, Inc. (the "Banc One Receivables Participation Agreement").

70.    This program was called the "Alliance Holdings ESOP Structured Finance Program."  The Bank One personnel responsible for the program were John Witten (a former Squire Sanders partner), James Henson, Barry Gowdy, Ronald Brooks, Michael Endres, David

Meuse, Brad Pospichel, and Daniel Jessee (collectively, the "Stonehenge Individuals"), all long-time business associates of Fenkell.

71.     Alliance's "spread" in the Alliance Holdings ESOP Structured Finance Program represented a pot of cash that became irresistible to both Fenkell and the Stonehenge Individuals.

72.     Squire Sanders performed the legal work relating to the Alliance Holdings ESOP Structured Finance Program for Alliance and for Bank One.

73.     Between April 1 and April 15, 1998, Draucker, Fenkell and the Stonehenge Individuals devised a scheme in connection with the Banc One Receivables Participation Agreement to funnel money to Fenkell individually out of the "spread" proceeds that would otherwise have flowed to Alliance.

74.     The scheme entailed Fenkell entering into a "Consulting Agreement" with Bank One by which he purported to provide consulting services in exchange for a "consulting fee" of approximately $125,000 per year.

75.     Sometime shortly before April 1, 1998, Draucker and others at Squire Sanders drafted the agreement with Banc One, which would become the model for the future "consulting agreements" Fenkell used to divert spread proceeds to himself in later deals.  Draucker and Fenkell caused Alliance to pay for this legal work.

76.     Fenkell caused Squire Sanders to create an entity for him called DBF Consulting, LLC, of which he was the sole member.  On information and belief, the LLC was originally created as an Ohio LLC, but Fenkell either created an additional LLC in Pennsylvania or re-registered the LLC from Ohio to Pennsylvania.  Regardless, Draucker and others at Squire Sanders knew and understood that DBF – Ohio or Pennsylvania – was Fenkell's personal entity designed to receive funds generated through Alliance transactions.

77.     DBF Consulting entered into its first "consulting agreement" with Bank One affiliate BOCP Holdings Corporation, an entity controlled by the Stonehenge Individuals, on April 15, 1998.

78.     In a transaction dated as of September 1, 1999, Fenkell caused an Alliance-related entity, A.H. III, to terminate the Bank One Receivables Participation Agreement and instead enter into the first of a series of receivables participation agreement with other subsidiaries of Bank One, Bank One Texas and Bank One Arizona (the "New Receivables Participation Agreement").

79.     The Stonehenge Individuals (still employees of Bank One) and Fenkell saw in the New Receivables Participation Agreement a means to enrich themselves further and advance their collective self interest, at Alliance's expense.

80.     In return for a substantially increased kickback to Fenkell, the Stonehenge Individuals jump-started their planned start-up investment banking boutique by furnishing illusory "services" to Alliance in exchange for millions of dollars otherwise owing to Alliance. All of the moneys for this scheme would be diverted from Alliance's portion of the  spread.

81.     The scheme included the Stonehenge Individuals taking advantage of Bank One's shedding of its consulting services business and forming a new "investment banking" entity called Stonehenge Financial Holdings, Inc. ("Stonehenge"), which, on information and belief,  they did with Squire Sanders' assistance, in April 1999, while continuing to work and draw paychecks from Banc One.

82.     Although they formed Stonehenge in April, the Stonehenge Individuals did not leave Bank One until much later, no earlier than July 29, 1999, and likely sometime in August,

after most of the work on the New Receivables Participation Agreement had been completed by them as Bank One employees and paid for by Bank One.

83.     Also after most of the work had been done, just three days before the closing of the New Receivables Participation Agreement, Stonehenge entered into a consulting agreement with the Alliance entities purporting to obligate Stonehenge to provide advice to A.H.I., Inc. ("AHI") and the Alliance ESOP in evaluating the New Receivables Participation Agreement and the Alliance Holdings ESOP Structured Finance Program (the "August 27 Agreement"). The deal documents for the Alliance Holdings ESOP Structured Finance Program specify what Bank One would earn for assembling the participation interest investment portfolio, but are silent on the level of fees to be paid to Stonehenge.

84.     Three days later, on September 1, 1999, Stonehenge and AHIII entered into an agreement that provided for large payments to Stonehenge and/or its affiliated entities for its "services." Because the Alliance Holdings ESOP Structured Finance Program had been operating for three years before Stonehenge became involved, and Bank One provided the structure of the participation interest investments, the "services" Stonehenge was to provide were illusory – they were neither required, nor provided.  Rather, the fees paid to Stonehenge under these two agreements were in fact a "cut" of the "spread" earned by Alliance on the New Receivable Participation Agreement.  This agreement was to continue until terminated by the parties, but the fee was renegotiated annually between Stonehenge and Fenkell, with Squire Sanders' participation.  (Collectively, the August 27 Agreement and the annual fee agreements are referred to herein as the "Stonehenge Contracts.")

85.     Fenkell's motive in causing Alliance to enter into the Stonehenge Agreements was to secure Fenkell's own "cut" of this deal, flowing from a "Consulting Agreement" entered into between his wholly-owned namesake company, DBF Consulting, Inc., and Stonehenge.

86.     Shortly before entering into the August 27, 1999 Agreement for the ESOP Structured Finance Program, the Stonehenge Individuals (still Bank One employees) caused Stonehenge to agree to a separate "Consulting Agreement" (dated August 7, 1999) with Fenkell's personal company, DBF Consulting. The DBF Agreement was signed by Brooks on behalf of Stonehenge.

87.     The DBF Agreement was the same form agreement entered into between DBF Consulting and BOCP Holdings approximately a year earlier, drafted by Squire Sanders. Draucker knew Fenkell was going to use the same agreement and advised Fenkell with respect to the DBF Consulting Agreement with Stonehenge.

88.     The Stonehenge/DBF Consulting Agreement provides that its term (which was to extend to August 31, 2006), could be terminated at any time "in which the total revenues derived by Stonehenge from ESOP related transactions is less than $2 million." Fenkell, an ERISA fiduciary, thus received compensation from Stonehenge, a party-in-interest, in connection with a transaction involving the ESOP's assets. Fenkell's payments under the arrangement were a kickback for agreeing to pay Stonehenge fees in connection with the ESOP Structured Finance Program.

89.     The DBF Agreement increased Fenkell's personal "cut" of the "spread" from the $125,000 he received before the involvement of Stonehenge, to $240,000, providing that Stonehenge would pay DBF Consulting a fee of $20,000 each month, regardless of whether DBF

Consulting provided any services, and would receive additional compensation if DBF Consulting provided any services to Stonehenge.

90.     The annual guarantee to DBF Consulting under the DBF Agreement was later increased to $500,000 annually.

91.     Between 1999 and 2011, the Alliance Holdings ESOP Structured Finance Program generated over $100,000,000 in investment returns, of which $28,831,985 went to Alliance as post-expense profits, while Stonehenge and Fenkell took over $34,000,000. Specifically, Stonehenge netted $34,475,553.72 in "fees," and from that amount paid Fenkell/DBF kickbacks totaling $4,018,333.46 calculated under the Stonehenge/DBF Consulting Agreement.

92.     At all times relevant hereto, Alliance was a current client of Squire Sanders, and at the same time, Squire Sanders also represented the Bank One entities and Stonehenge. Moreover, Squire Sanders represented DBF as well.

93.     On information and belief, Squire Sanders advised the Stonehenge Individuals at Stonehenge while they were at Bank One and continuing to the time they left to form their new venture.   On information and belief, Squire Sanders never asked Alliance to consent to any conflicting representation of Stonehenge.  Any conflict was unwaivable.  Even if it were waivable, however, Alliance and the Alliance ESOP never consented to it.  And to the extent consent was sought on Alliance's or the Alliance ESOP's behalf from Fenkell himself, his self-interest rendered him incapable of consenting on Alliance's or the Alliance ESOP's behalf.

94.     Indeed, any request for consent would have been illusory and invalid, as Fenkell orchestrated and the Stonehenge Individuals conspired with him to perpetrate the fraud on and looting of Alliance and the ESOP for their benefit as described above.

95.     Squire Sanders facilitated Stonehenge's looting of Alliance and the Alliance ESOP from 1999 through 2011, which provided no (or at most minimal) services to Alliance and the Alliance ESOP.  Likewise, Squire Sanders knew of and facilitated the diversion of Alliance funds to Fenkell personally through the DBF Agreement.

96.     Squire Sanders knew the purpose of the Stonehenge Contracts and the DBF Agreement was to funnel money to Stonehenge, and a portion of the money paid under the Stonehenge Contracts to Fenkell's personal company, DBF Consulting.  These payments to Stonehenge transferred ESOP plan investment earnings to Stonehenge and siphoned off profits of Alliance, thereby diluting the value of the Alliance stock held by the Alliance ESOP and AH Transition.

97.     Alliance never gave its informed consent to the inherent conflicts between Squire Sanders' representation of Alliance, on the one hand, and DBF Consulting, on the other, in connection with the Stonehenge Contracts and in connection with the DBF Agreement.  As usual, Squire Sanders opted to assist Fenkell and his personal consultancy instead of protecting its client, Alliance.

98.     These transactions were to the detriment of the Alliance Entities, and they were harmed thereby.

### Squire Sanders Aids DBF Consulting In Raiding Alliance And The Alliance ESOP

99.     The Stonehenge/DBF Agreement is but one example of Fenkell's inability to resist capturing money flowing out of Alliance and the Alliance ESOP for himself.

100.     Fenkell, with the assistance of Squire Sanders, formed DBF Consulting in late February 1998.  DBF Consulting also has a number of subsidiaries through which it structured several of the transactions in question here as well.

101.    Fenkell designed and used DBF Consulting to siphon off money paid by Alliance in various transactions to Fenkell, and to take advantage of corporate opportunities that otherwise belonged to Alliance, in breach of Fenkell's fiduciary duties.

102.    Fenkell used DBF Consulting to profit personally from certain deals entered into by Alliance with Brookdale, a publicly-traded entity that develops and manages senior living facilities.

103.    From 1998 to 2004, with the participation of Squire Sanders, and in particular partner Erik Rickard, Fenkell arranged for Alliance and DBF Consulting to participate in various sale/leaseback transactions with Brookdale in connection with the development of eight senior living facilities.

104.    In connection with at least six of these transactions, Fenkell caused DBF Consulting to be paid an "origination fee" of $15,000 from Bank One, which was providing loan financing, and another $10,000 from Brookdale.  On information and belief, DBF received at least $120,000, along with tax benefits as a result of these transactions.

105.    By contrast, Alliance received an annual fee of only $10,000 per transaction.

106.    On information and belief, there was also at least one instance in which Fenkell caused the ownership interest in a Brookdale property to be transferred from an Alliance subsidiary directly to DBF Consulting, in return for $10.

107.    On information and belief, certain other Brookdale projects were financed solely through DBF Consulting, with Alliance being deprived of the chance to participate.

108.    In sum, these actions by Fenkell in connection with the Brookdale transactions deprived Alliance of corporate opportunities from which it would have benefitted.

109.    Squire Sanders, and in particular partner Erik Rickard, aided Fenkell in his undisclosed breach of his fiduciary duties in connection with the Brookdale transactions – sometimes representing Alliance, sometimes representing DBF Consulting alone, and in at least one transaction representing both Alliance and DBF Consulting simultaneously.

110.    Squire Sanders did not obtain a written consent of the obvious conflicts posed by its representation of DBF Consulting while it was also representing Alliance in the Brookdale transactions.  These conflicts were unwaivable.  If any of these conflicts were waivable, however, Alliance and the Alliance ESOP never consented to any such conflicts.  And to the extent consent was sought on Alliance's or the Alliance ESOP's behalf from Fenkell himself, his self-interest rendered him incapable of consenting on Alliance's or the Alliance ESOP's behalf.

111.    Squire Sanders also used Alliance's and the ESOP's confidential information against them in connection with its representation of Brookdale, Stonehenge and DBF Consulting, including information about Alliance's business opportunities and business methods.

112.    These transactions caused the Alliance Entities substantial injury and damages.

### The SLMRS Agreement

113.    In 2010, Squire Sanders and certain of its partners and co-conspirators began to effectuate yet another betrayal of Alliance – siphoning off of moneys directly for the benefit of Squire Sanders partner Sefcovic and his wife Lianne Sefcovic, and indirectly for the benefit of Draucker's alma mater and pet project, Hiram College, of which he served as secretary and trustee.

114.    By 2009, Alliance had already begun exploring investments in the student loan industry and in 2010 purchased Northstar Capital Markets Services, Inc. ("NCMS"), a provider of master servicing to the student loan industry. It also had a contractual arrangement with

Student Loan Capital Strategies ("SLCS") which provided Alliance with advice on investment/acquisition opportunities in the industry.

115.   In August 2010, Lianne Sefcovic formed Student Loan Advisory Management Services, LLC ("SLAMS"), an Ohio LLC.

116.   In August 2010, Draucker incorporated Student Loan Management and Research Services, LLC ("SLMRS"), an Ohio LLC.  SLAMS possesses a 90% membership interest in SLMRS, and a for-profit affiliate of Hiram College possesses the other 10% interest.

117.   Beginning on September 1, 2010, running through September 30, 2012, Fenkell caused Alliance to enter into an Advisory Services Agreement ("SLMRS Agreement") with SLMRS, under which Alliance paid SLMRS $660,000 for alleged "services" to Alliance that were, in fact, never provided.

118.   Ninety percent of the payments that SLMRS received from Alliance were in fact directed to SLAMS, for the personal benefit of the Sefcovics.

119.   The remaining 10% of the funds were directed to Hiram College.

120.   While Alliance was paying SLMRS, of which at least $600,000 went to the Sefcovics, Alliance was also paying Squire Sanders legal fees (*for Sefcovic's own time* and for which Sefcovic was the billing partner) related to Alliance's transactions in the student loan field.  Thus, Sefcovic profited in three ways:  (1) billing his own time to pad his billable hours, which factored into his compensation and partner evaluation at the firm; (2) increasing Squire Sanders' billing for Alliance which factored into his compensation and partner evaluation; and (3) taking the fruits of his labor personally in the form of cash to his wife and himself.

121.   Squire Sanders represented SLMRS and SLAMS.

122.     The scheme through which SLRMS looted Alliance was concocted and orchestrated by Fenkell and Draucker, working secretly and in concert with each other and the Sefcovics, to benefit the Sefcovics and Hiram College.  Already having acquired NCMS to provide student loan services and having engaged SLCS to advise on the student loan industry, Alliance had no need for the services allegedly contracted for with SLMRS and SLMRS provided no such services.

123.     On information and belief, Fenkell was motivated to enter into this fraudulent scheme by his friendship with Sefcovic, by Sefcovic's position as Chair of the Compensation Committee and resulting impact on his compensation, and his desire to reward Sefcovic for his loyalty and the assistance Sefcovic and Squire Sanders had rendered to him in connection with his attempts to siphon funds from Alliance and the Alliance ESOP.

124.     On information and belief, Draucker first suggested the structure of the SLMRS/SLAMS/Alliance relationship to Fenkell in an e-mail dated May 13, 2010 (copied to Sefcovic), in which he outlined a series of corporate relationships that resembled what the SLMRS/SLAMS/Alliance relationship became, ending with the question, "If you think this structure may be of interest to anyone, just let me know."

125.     Later that day, Fenkell forwarded Draucker's e-mail to Sefcovic, and asked "Do you understand how this pertains to our transaction?", to which Sefcovic responded, "not really. Do you want to have a joint call with him or should I just get the details?"

126.     Draucker himself or others at Squire Sanders acting under his direction drafted the SLMRS Agreement on behalf of SLMRS and/or Hiram College, to Alliance's detriment.

127.     On information and belief, Squire Sanders and its attorneys also drafted the documents that created SLAMS.

128.    Although SLMRS and SLAMS were to provide certain consulting services to Alliance, no such services were either needed or provided.

129.    Moreover, Fenkell and Sefcovic concealed the nature of the SLMRS Agreement and that no services were being rendered in exchange for the payments made to SLMRS thereunder.

130.    At some point in 2012, Sefcovic sought to alter the SLMRS Agreement so that it would not require annual renegotiation and reexecution, but would rather continue year-to-year unless expressly terminated.

131.    Specifically, Sefcovic stated to Fenkell in a voicemail message on or about September 12, 2012, that this would allow Fenkell to "not be involved in the future," and that "if no one sees or does anything with it, it continues[.]"

132.    On information and belief, when Alliance confronted Squire Sanders with its discovery of the SLMRS Agreement and the attending circumstances, Squire Sanders expelled or otherwise arranged for Sefcovic's departure from the firm.

133.    Alliance never gave informed consent to the obvious conflict between Squire Sanders representing SLMRS and SLAMS, on the one hand, and Alliance on the other, or the covert monetary benefits received by Squire Sanders' partner Sefcovic and his wife.  Those conflicts were unwaivable.  Even if any of those conflicts were waivable, however, Alliance and the Alliance ESOP never consented to any such conflicts.  And to the extent consent was sought on Alliance's or the Alliance ESOP's behalf from Fenkell himself, his self-interest rendered him incapable of consenting on Alliance's or the Alliance ESOP's behalf.

134.    Not only did Squire Sanders represent another client with interests directly adverse to its client Alliance, but Squire Sanders misused Alliance's own confidential

information against it, and otherwise conspired with Fenkell to cover up the conflict and Alliance's injury.

**Acquisition Of Trachte And The Chesemore *Litigation***

135.    Squire Sanders' manifest conflict of interest inherent in representing both Alliance and Fenkell recently had tangible adverse consequences in connection with the disposition of a portfolio company and in ensuing litigation concerning that transaction.

136.    Trachte designs, manufactures, and builds pre-engineered and customized steel self-storage systems.

137.    From September 2002 until August 29, 2007, Trachte was a subsidiary of Alliance, and Alliance was ultimately Trachte's majority shareholder.

138.    On August 29, 2007, Alliance sold its interest in Trachte to a newly-formed entity, the Trachte Building Systems, Inc., Employee Stock Ownership Plan. ("Trachte ESOP"), the participants of which were former participants in the Alliance ESOP who worked for Trachte.

139.    Trachte employees' Alliance ESOP accounts were spun off into the new Trachte ESOP, after which shares of Alliance and AH Transition stock held in those accounts were exchanged for Trachte shares held by Alliance.

140.    Trachte took out loans to purchase Trachte stock, and for other purposes related to the sale.

141.    Trachte then loaned the remaining proceeds of its loans to the Trachte ESOP, which then purchased all of Trachte's outstanding equity.

142.    The structure of the Trachte transaction was masterminded by Draucker and Fenkell, was executed by Squire Sanders, and was designed to enrich Fenkell and insulate him

from fiduciary responsibility resulting from any adverse consequences of the deal through a complex, stepped transaction.

143.    In 2009, a putative class of Trachte employees sued Alliance, AH Transition, AHI, and Fenkell over the Trachte spin-off in the United States District Court for the Western District of Wisconsin, *Chesemore v. Alliance Holdings, Inc. et al.*, 09-cv-000413 (W.D. Wisc.).

144.    The *Chesemore* plaintiffs alleged that:  (1) the transfer of assets from the Alliance ESOP to the Trachte ESOP violated ERISA because the Alliance and AH Transition stock had less value after the transfer than before the transfer; (2) the stock was exchanged for overpriced Trachte stock; (3) the actual value of the participants' accounts, which consisted almost entirely of Trachte stock, was further minimized because Trachte acquired more debt than it could reasonably service in order to finance the transaction; and (4) Fenkell's "take" from the transaction in the form of proceeds of a phantom stock plan was based on the price paid for the Trachte stock by the Trachte ESOP, putting Fenkell's personal interests in conflict with the interests of the Trachte ESOP participants and beneficiaries.

145.    Squire Sanders entered its appearance for Alliance, Fenkell, the Alliance ESOP, AHI, and AH Transition, and continued to represent all of them in *Chesemore* until some point in 2012.

146.    After certifying *Chesemore* as a class action, the *Chesemore* court held a trial on the Plaintiffs' allegations.  On July 24, 2012, the court determined that the price paid for this equity in Trachte was more than its fair market value. *See Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007 (W.D. Wisc. 2012).

147.    The Court, sitting as a finder of fact, determined that Fenkell had orchestrated the sale of Trachte on terms favorable to himself, and unfavorable to the Trachte ESOP, including, *inter alia*, the receipt of approximately $2.9 million through the Trachte Phantom Stock Plan.

148.    The Court found that Fenkell's actions breached his fiduciary duties to the Alliance ESOP under section 404(a) of ERISA, and that he had engaged in transactions prohibited by section 406(b) of ERISA.

149.    Though the Court determined that Fenkell was "far and away the most culpable party," it also determined that Alliance breached its fiduciary duties to the Alliance ESOP under section 404(a) of ERISA, that it was liable as a co-fiduciary for Fenkell's breaches under section 405(a) of ERISA, and that AH Transition and AHI had "knowingly participated" in the fiduciary breaches of Fenkell and Alliance.

150.    The Court concluded that defendants breached their fiduciary duties to the Alliance ESOP by, *inter alia*:  (1) requiring the trustees of the Trachte ESOP to rely on the opinion of the value of the consideration to be paid in the transaction prepared by the firm retained by Alliance to value Trachte as a holding of Alliance, Stout, Risius, and Ross ("SRR"); (2) limiting the authority and assignment of the firm retained by the Trachte ESOP Trustees, Barnes Wendling Valuation Services, Inc. ("Barnes Wendling") to providing a fairness opinion on the proposed transaction; and (3) restricting the scope of the engagement of the independent fiduciary retained by the Trachte ESOP fiduciaries, Alpha Investment Consulting, LLC, to simply recommending whether the proposed transaction should be approved or not – a simple "thumbs up or thumbs down," with no "renegotiation" of any aspect of the deal permissible, and with Alpha forced to rely on the valuation opinion given by Barnes Wendling, which in turn relied on the opinion of SRR.

151.   Draucker had advised Alliance and Fenkell to take each of the specific actions that were cited by the Court as the specific breaches of fiduciary duty set forth in Paragraph 150 above.

152.   In addition, Draucker had advised Alliance that the multi-step Trachte spin-off transaction would insulate Fenkell and Alliance from liability as fiduciaries because their conduct would be limited to performing "settlor" functions, as the sponsor of the Plan.

153.   Squire Sanders represented, or otherwise gave legal advice to Fenkell, Alliance and the Alliance ESOP  in connection with the spin-off of the interest in Trachte to the Trachte ESOP.

154.   Furthermore, Squire Sanders acted in concert with Fenkell in his obtaining benefits from the Trachte transaction.

155.   These unconsented-to multiple representations and the conflicting loyalties they engendered inured to the *Chesemore* Plaintiffs' detriment, and caused harm to Alliance and the Alliance ESOP.

156.   Squire Sanders' actions and advice thus directly and proximately caused the breaches and errors identified by the *Chesemore* court.

157.   Squire Sanders represented Fenkell, Alliance and the Alliance ESOP in the *Chesemore* litigation, even though, as co-defendants, a conflict of interest existed among them.

158.   Squire Sanders also represented Fenkell, Alliance and the Alliance ESOP in the *Chesemore* litigation notwithstanding that its attorneys had devised precisely the structure of the transaction that the plaintiffs in the litigation challenged.

159.   The Squire Sanders conflict of interest substantially interfered with its ability to represent each of the parties individually.

160.    For instance, it could have been in the Alliance Entities' best interests to blame Fenkell for the structuring of the Trachte transaction, and for other misconduct. This strategy was impossible because Squire Sanders represented Alliance, the ESOP, and Fenkell. The conflict of interest disqualified Squire Sanders even from making the decision as to the merits of such a litigation strategy.

161.    As another example, it could have been to the Alliance Entities' benefit to blame Squire Sanders for negligent and/or intentionally incorrect legal advice leading to the structure of the Trachte transaction. This strategy was also impossible given Squire Sanders' own interest.

162.    Squire Sanders did not advise Alliance or the ESOP of the conflict of interest inherent in its joint representation of Alliance, the ESOP and Fenkell in the *Chesemore* litigation, and obtained no waiver from Alliance or the ESOP of this conflict. And to the extent consent was sought on Alliance's or the Alliance ESOP's behalf from Fenkell himself, his self-interest rendered him incapable of consenting on Alliance's or the Alliance ESOP's behalf.

163.    On June 4, 2013, the *Chesemore* court issued its decision on the remedies owed to the plaintiffs.

164.    Significantly, the court:  (1) required Alliance, AHI, and Fenkell to reinstate a subclass of the *Chesemore* plaintiffs to the Alliance ESOP; (2) determined that Alliance, AH Transition, AHI, and Fenkell were jointly and severally liable to restore $7,803,543 (plus prejudgment interest) to the Alliance ESOP, which is to be allocated to various participants' ESOP accounts; and (3) ordered that the trustees of the Trachte ESOP pay $6,473,856.89 (plus prejudgment interest) to the Trachte ESOP, but that Alliance, AH Transition, AHI, and Fenkell are required to indemnify the Trachte ESOP trustees.

165.    Once Alliance's new management discovered Squire Sanders' participation in Fenkell's long pattern of bad acts, and the fact that Fenkell had funneled Alliance funds to Squire Sanders, Morgan Lewis LLP replaced Squire Sanders as counsel for Alliance in *Chesemore*.

166.    On May 3, 2013, Alliance filed a motion with the *Chesemore* court to assert several additional affirmative defenses, including cross-claims against Fenkell – claims that Squire Sanders should have pleaded in the first instance, if the firm had been properly representing Alliance's interests.

167.    On June 12, 2013, however, the court denied Alliance's motion, specifically commenting that it was "[t]oo late" for "Alliance [to] suddenly wish[] to change its strategy, pointing fingers at" Fenkell – even though Alliance would not have been able to make that argument earlier with Fenkell at the helm of Alliance and his lawyers at Squire Sanders responsible for the defense of *Chesemore*.

168.    The *Chesemore* plaintiffs and Alliance ultimately agreed to settle the plaintiffs' claim against the Alliance defendants (Alliance Holdings, AHI, and AH Transition) by, *inter alia*, having Alliance restore $7 million to the accounts of the plaintiffs in the Alliance ESOP ($5.5 million in stock, and $1.5 million in cash); pay $150,000 into a settlement fund to settle the claim for indemnification and contribution awarded to the Trachte trustee defendants; assign to the plaintiff class a note that Alliance received in the Trachte sale; and pay $5.325 million to the plaintiff class's counsel in attorneys fees and costs.

169.    Alliance's obligation under this settlement arises from Fenkell's and Squire Sanders' joint misconduct – including, but not limited to, Squire Sanders' representation of Alliance in connection with the Trachte transaction, its acting in concert with Fenkell to

maximize his personal benefit, and its unconsented-to joint representation of Alliance, the

Alliance ESOP and Fenkell in the *Chesemore* litigation.

**Fenkell And Drauker Conspire To Undermine And Manipulate The Compensation Committee's Consideration Of Fenkell's Compensation**

170.    From 1995 up to early 2000, Fenkell received compensation in excess of his

Alliance earnings, and the benefits derived from the Alliance Long Term Incentive Plan, by

setting up "consulting" contracts between DBF Consulting and entities with which Alliance did

business.

171.    These included DBF "consulting" agreements with BOCP Holdings Corporation

(a Banc One entity), Brookdale, and Stonehenge.

172.    Beginning at least as early as 2000, Alliance established a Compensation

Committee that was responsible for, *inter alia*, setting Fenkell's annual compensation and was

designed to provide a veneer of legitimacy and independence to Fenkell's compensation.

173.    Under Section 8.1 of Alliance's bylaws, the compensation of the officers of

Alliance must be approved by the Compensation Committee.

174.    At all times relevant hereto, at least two or three people other than Fenkell served

on the Compensation Committee.

175.    These persons were not independent.   For instance, Sefcovic served on the

Compensation Committee from 2002 through September 2012, and was Chair of the

Compensation Committee from approximately 2005 until September 2012.

176.    Draucker performed the functions of secretary to the Compensation Committee

from approximately 2005 until September 2012, and served as the intermediary through which

information flowed from Alliance to its consulting firm, Mercer Human Resources Consulting

("Mercer"), and from Mercer to the Committee.  By doing so, Draucker – conspiring with
Fenkell – controlled the information that reached the Committee.

177.   All of the elements of Fenkell's compensation and how it was structured were
designed and implemented by Draucker.  He drafted the Compensation Committee Charter that
omitted any consideration of compensation received by Fenkell from subsidiary payouts (many
of which were substantial).  He drafted every Phantom Stock Plan document, and he drafted and
sent Mercer the (inaccurate) wording to include in its study relating to Fenkell's phantom stock
expectations that masked the significance and value of his expectations.  He designed the
Alliance Long Term Incentive Plan under which Fenkell received over $8 million from 2008
through February 2012 and, in concert with Fenkell, made sure that the Compensation
Committee was not given full information about the payments made or to be made to Fenkell
under the LTIP.  He designed another plan, the NCMS Plan, for acquired portfolio company
NCMS, and saw to it that it was approved by the company, and then falsely told Mercer that
Fenkell derived no value from that plan (which they wrote in their report) even though he had
already received a payment under it.

178.   Both the lack of independence and the control and manipulation of information
reaching the Committee prevented the Committee from performing independently and rendering
unbiased and valid decisions.

179.   Draucker and Sefcovic, and therefore Squire Sanders, are responsible for the
conduct of the Compensation Committee.

180.   Ostensibly, the Compensation Committee set Fenkell's compensation at a level
that it believed would be deemed "reasonable" by regulatory authorities.

181.   In connection with that process, Alliance relied on Mercer to provide benchmarks for a reasonable range of what Fenkell's compensation (and that of certain other Alliance personnel) should be.  So long as Fenkell's compensation fell within the "bands" set by Mercer, the Committee approved it.   However, the compensation number for Fenkell presented to the Committee omitted elements of compensation that would have caused his compensation to exceed by far Mercer's top "band."

182.   From 2001 through 2011, Fenkell's combined salary and bonus was between $766,390 and $910,000 annually.  He was also awarded cash grants totaling $3,125,000 between 2008 and 2011.  Fenkell also received remuneration from phantom stock and incentive programs totaling at least approximately $27 million between 2001 and 2011.

183.   Some portion of Fenkell's compensation was attributable to the performance of Alliance's subsidiaries and affiliates, and was deliberately hidden from the Compensation Committee by Fenkell, Draucker, and Squire Sanders through the charter of the Compensation Committee that made such compensation irrelevant for purposes of the Compensation Committee's analysis.

184.   In addition, as set forth herein, Fenkell was actually profiting far more from his relationship with Alliance, including:  (1) his receipt of at least $4,018,333.46  under the Stonehenge kickbacks that was passed on to him from DBF Consulting; (2) tax benefits that flowed to him through DBF Consulting; and (3) the fees and property he received from the Brookdale transactions.

185.   Fenkell knew of and facilitated all of these illegal payments.  Sefcovic knew of these illegal payments.  Draucker knew of these illegal payments.  Rickard knew of these illegal

payments.  But they kept the existence of these additional sums from the other members of the Compensation Committee and from Mercer.

186.    As a consequence, neither the work of Mercer in benchmarking Fenkell's compensation, nor the endorsement by the Committee carries any weight or validity.  In its entirety, Fenkell's compensation exceeded any measure of reasonableness and exceeded the range even Mercer considered reasonable.

### Fenkell And Alliance Enter Into A New Employment Agreement To Alliance's Great Detriment

187.    In early 2012, Fenkell directed Draucker and Squire Sanders to prepare a draft Employment Agreement for Fenkell to replace his existing employment agreement.  This was eventually executed and dated as of July 1, 2012 ("July 1, 2012 Employment Agreement").

188.    Squire Sanders' bills to Alliance reflect that Draucker prepared the draft Employment Agreement on March 28, 2012, the same day that summary judgment was denied in *Chesemore*.

189.    Fenkell and Squire Sanders knew as of this date that the Court in *Chesemore* was unlikely to accept many of the arguments they were advancing, rendering more likely that Fenkell and Alliance would be held liable and that his employment could be in jeopardy.

190.    Although Draucker claims he was representing Alliance and not Fenkell in this work, it was Fenkell and Draucker who agreed on the terms, evidenced by the fact that Draucker provided the draft to Fenkell for his comment and edits before providing it to anyone else at Alliance or Alliance's Compensation Committee.

191.    The July 1, 2012 Employment Agreement included new terms related to Fenkell's compensation, including:  (a) that Fenkell would serve as President and CEO of Alliance for a seven-year term; and (b) that if terminated without "cause", Fenkell would enjoy a new

severance package worth approximately $11 million, approximately $10 million greater than the severance to which Fenkell was entitled under his prior employment agreement.

192.    The July 1, 2012 Employment Agreement also included a new definition of "cause" that could significantly limit Alliance's ability to terminate Fenkell's employment. This term differed significantly from the "cause" provision in the employment agreements Alliance had previously executed.

193.    Members of the Compensation Committee were not provided with a meaningful opportunity to comment on, or question, the July 1, 2012 Employment Agreement. In his capacity as Secretary to the Compensation Committee and as lawyer for Alliance, Draucker presented it to the Compensation Committee along with a written action and a meeting request so that it could be approved.

194.    The Compensation Committee went along with the new employment agreement in part because, not knowing anything about the *Chesemore* litigation, they believed the purpose of the new employment agreement was to bind Fenkell to continue as the CEO of Alliance for seven years, which they thought benefitted Alliance. However, the agreement did not bind Fenkell at all, but rather the changes from his prior agreement worked only to his benefit, providing him with a seven-year term and seven years of severance if terminated. Nothing prevented Fenkell from quitting before seven years have expired.

195.    Fenkell's frenzy to change the terms of his employment agreement at this time resulted from his recognition that, the trial in *Chesemore* having concluded, and the court's decision still being awaited, there was an imminent danger of an adverse ruling which could impact his future employment.

196.    But the Compensation Committee was never even told about the *Chesemore* litigation whatsoever, by Fenkell, Sefcovic or Draucker, much less furnished with information about the status or prospects of the litigation that might allow it to consider the employment agreement in context.

197.    Mercer was not provided with a copy of the draft July 1, 2012 Employment Agreement to opine on its reasonableness.

198.    William Vogelgesang and Eliot Hermanson, the ostensibly independent Compensation Committee members, were not given other information that would have been relevant to their decision whether to consent to the July 1, 2012 Employment Agreement, including the existence of Fenkell's other additional compensation, the nature and extent of Fenkell's relationships with Sefcovic and Draucker, Squire Sanders' conflicts, Draucker's multiple roles, the existence and status of the *Chesemore* litigation and Fenkell's wrongful and unfaithful conduct against Alliance's interests.

199.    The July 1, 2012 Employment Agreement was purportedly approved by written consent of the Compensation Committee, but Vogelgesang never provided his written consent.

200.    Nevertheless, Fenkell treated the July 1, 2012 Employment Agreement as if it were a finalized document, and caused Alliance to treat it accordingly.

201.    On or about July 24, 2012, Wanko and Spear learned of the adverse decision in *Chesemore* that found Alliance and Fenkell liable for violations of ERISA and breaches of Fenkell's fiduciary duties to the Alliance ESOP – a potential development of which Fenkell and Squire Sanders had long been aware, and withheld from the Compensation Committee.

202.    In response to the *Chesemore* ruling, Fenkell and Squire Sanders orchestrated Fenkell's resigning as CEO and President of Alliance and from the Alliance Board.

203.    Squire Sanders worked with Fenkell to ensure that his control over Alliance and the Alliance ESOP would nevertheless continue.

204.    Fenkell resigned as President and CEO of Alliance on September 25, 2012, purporting to remain as a non-executive employee of Alliance after that date.

205.    Fenkell and Draucker devised a method by which Fenkell could seemingly relinquish control over the Board of Alliance and yet nevertheless retain control.  With Draucker's advice, Fenkell expanded the Board to three persons and added Ken Wanko and his personal friend Marty McCarthy.  Fenkell knew he could not control Wanko but could control McCarthy, who had earned several hundred thousand dollars through serving as a broker in deals between his accounting clients and Alliance.

206.    Fenkell requested that Draucker draft an amendment to the July 1, 2012 Employment Agreement (the "Amendment"), which he did.  Among other items, the Amendment provided that Alliance would indemnify Fenkell for any losses or damages incurred as a result of the performance of his duties for Alliance or the Alliance ESOP, specifically "including, without limitation, all legal fees and other expenditures and losses (including, without limitation, asset forfeitures and recoupments, and/or payment of damages) incurred by [Fenkell] and/or [Fenkell's] spouse as a result of" the *Chesemore* decision.

207.    At the time, Draucker, Sefcovic and others associated with Squire Sanders knew that Fenkell had been found liable for breaches of ERISA and fiduciary duty in *Chesemore*. Squire Sanders and Fenkell knew or should have known that indemnifying Fenkell for a known, adjudicated breach of fiduciary duty violated ERISA, yet the Amendment nonetheless provided for indemnification against that very finding.  It also provided for indemnification of any award against Fenkell's wife, to whom Fenkell had transferred his Trachte phantom stock proceeds to

hide them from the *Chesemore* plaintiffs and the Court, which protection was not present in the July 1, 2012 Employment Agreement.

208.   After Draucker prepared and Fenkell had reviewed the Amendment, Draucker assigned his partner Hughes the task of representing Alliance in the "negotiations." Fenkell retained his own counsel, Martin Trichon, to "represent" him in negotiations with Hughes over this Amendment, all designed to provide the veneer of an arm's length transaction.

209.   Hughes participated in a call with Fenkell and Trichon, accepted all of their proposed revisions to the draft Amendment, and sent the Amendment back to Fenkell without consulting with anyone else associated with Alliance about the changes.

210.   Draucker also failed to discuss the Amendment with anyone associated with Alliance except Fenkell prior to its circulation to the Alliance Board.

211.   Although the Amendment implicated Fenkell's compensation, and under Alliance's bylaws should have been submitted to the Compensation Committee for approval, it was only submitted to the Alliance Board for review and approval, because Fenkell knew he could control the Board, where, with his friend Marty McCarthy, he had a majority.

212.   Fenkell informed the Board that the Compensation Committee did not need to review and approve the Amendment because the Compensation Committee had already reviewed and approved the July 1, 2012 Employment Agreement.

213.   This statement was false, as the Compensation Committee had not formally approved the July 1, 2012 Employment Agreement and had not even been provided with the usual complement of relevant information it would consider in making such a determination. Moreover, the changes contained in the Amendment were substantial and it could not have been

presumed that a reasonable committee would approve them simply because it had approved the July 1, 2012 Employment Agreement.

214.    Both Wanko and Spear believed that Fenkell would terminate their employment, and Fenkell would find another way to effectuate his ultimate plan, if they objected to the terms of the Amendment.  They also knew, from their years working at Alliance, that any substantive discussion with anyone at Squire Sanders would be communicated by the Squire Sanders lawyers to Fenkell.  They also believed that Fenkell would refuse to step down as President and CEO of Alliance – a development that would be detrimental to Alliance – if the Amendment was not adopted.

215.    Spear was the Trustee of the ESOP at this time, having been appointed by Fenkell on July 2, 2012.  The *Chesemore* ruling issued on July 24, 2012.  After Spear had a chance to review the ruling, in a telephone conversation between Spear, Fenkell, and Draucker, Spear asked Fenkell whether, as Trustee of the Alliance ESOP, she should retain her own counsel.  Before Fenkell could even respond, Draucker – desperately seeking to conceal his, Squire Sanders' and Fenkell's misconduct – not only failed to recommend that Spear retain separate legal counsel, but hastily told Spear not to do so.

### Alliance Discovers Fenkell's And Squire Sanders' Wrongdoing

216.    On July 2, 2012, Wanko became a member of the Alliance Board, and became CEO and President of Alliance on September 25, 2012.

217.    In August 2012, Wanko was given limited check signing authority on behalf of Alliance to co-sign checks over $3500.  This was the first time, at least since 2005 and perhaps ever, that anyone other than Fenkell had any check signing authority at all, a clear lapse of internal controls made possible by the ironclad control exercised by Fenkell and the lax corporate governance supported by Squire Sanders.

218. At some point on or around September 1, 2012, in reviewing checks prepared by Kathleen Rosenello, Alliance's Assistant Controller, and given to him for signature, Wanko noticed a check made out to SLMRS, an entity about which he had no knowledge.

219. The subsequent investigation by Alliance, its new outside counsel and a forensic accountant (both retained without Fenkell's knowledge) eventually revealed the Fenkell/Stonehenge plundering of the ESOP; the secret SLMRS Agreement and the illicit arrangement spearheaded by Draucker, Fenkell, and Sefcovic; and Drauker's and Sefcovic's failures to report these illicit activities to the Compensation Committee.

220. On October 1, 2012, Fenkell was placed on administrative leave by Alliance.

221. On that same date, Wanko transmitted a letter to Squire Sanders via e-mail, in which he informed Squire Sanders that Fenkell was no longer authorized to act for Alliance, and that Alliance would only deal with Hughes, and not Sefcovic or Draucker, going forward.

222. Alliance terminated Squire Sanders' representation of it and its affiliated entities on approximately December 13, 2012.

223. Fenkell resigned his employment with Alliance effective November 26, 2012. Fenkell claimed "good reason" for resigning, purporting to trigger the severance payments under the July 1, 2012 Employment Agreement. Both the expanded "good reason" definition and the enormously increased severance obligations upon termination without "good reason" resulted from the complicity between Fenkell and Draucker.

224. Fenkell filed suit in the Court of Common Pleas of Philadelphia County seeking to recover amounts allegedly owed under the July 1, 2012 Employment Agreement and the Amendment thereto. To the extent Alliance has to pay any amounts attributable whatsoever to

those agreements, a proximate cause was Squire Sanders' actions, and Squire Sanders should be held responsible.

## COUNT ONE

### LEGAL MALPRACTICE:  VIOLATION OF THE DUTY OF LOYALTY / OBLIGATION TO BE FREE OF CONFLICTS

225.     Paragraphs 1 through 224 are incorporated as if set forth in full here.

226.     At all times from 1995 through approximately December 13, 2012, Squire Sanders represented Alliance and the Alliance ESOP in various legal matters, and Alliance and the Alliance ESOP were at all times current clients of Squire Sanders.

227.     As current clients, Squire Sanders owed Alliance and the Alliance ESOP an undivided, unqualified duty of loyalty at all times relevant hereto.

228.     Under concepts of fiduciary duty law, principal/agent principles, and rules of attorney ethics that applied to the attorney-client relationship between Squire Sanders and Alliance or Squire Sanders and the Alliance ESOP, Squire Sanders was not permitted to represent any client in connection with a matter adverse to Alliance or the Alliance ESOP, unless, *inter alia*, the client gave its informed and effective consent.

229.     At no time did Alliance or the Alliance ESOP provide its informed and effective consent to any representation by Squire Sanders of another client (and certainly not Fenkell, DBF Consulting, Stonehenge, or SLMRS) in a matter adverse to Alliance or the Alliance ESOP.

230.     Yet despite this, Squire Sanders intentionally and knowingly represented and/or otherwise gave legal advice to other clients on matters in which Alliance and/or the Alliance ESOP were adverse, including, but not limited to, Fenkell, DBF Consulting, Stonehenge, and SLMRS.

231.    Squire Sanders also had an undisclosed and unconsented-to conflict stemming from the firm's own interest in its significant clients, including but not limited to Fenkell, DBF Consulting, and Stonehenge.

232.    Personal interests and conflicting fiduciary duties of Squire Sanders' attorneys, such as Draucker's service on the Board of Trustees of Hiram College, also created unconsented-to conflicts for Squire Sanders.

233.    To the extent Squire Sanders ever sought Alliance's or the Alliance ESOP's consent to a conflict from Fenkell, Fenkell was incapable of providing Alliance's or the Alliance ESOP's consent, as he was self-interested and tainted by his own conflict.

234.    Moreover, on information and belief, if it even would have been ethically relevant, Squire Sanders never established appropriate ethical screens to separate those who worked on Alliance matters from those who represented adverse interests.

235.    As a consequence, Squire Sanders used Alliance's and the Alliance ESOP's confidential business information, including, but not limited to, information about Alliance's business opportunities, business methods, and internal policies and controls, against Alliance and the Alliance ESOP to their detriment.

236.    These breaches were a direct and proximate cause of injury to the Alliance Entities, including, but not limited to, the funds paid to Stonehenge and DBF Consulting as a result of the Stonehenge Contracts and Stonehenge's agreement with DBF Consulting, the amounts paid to SLMRS and SLAMS under the SLMRS Agreement, the financial loss to the Alliance Entities resulting from the Trachte transaction and the *Chesemore* litigation, the entry into Fenkell's employment contract and the amendment thereto, and funds Fenkell received as part of the Brookdale transactions.

## COUNT TWO

### LEGAL MALPRACTICE:  VIOLATION OF THE DUTY OF CARE

237.    Paragraphs 1 through 236 are incorporated as if set forth in full here.

238.    At all times from 1995 through approximately December 13, 2012, Squire

Sanders served as attorneys for Alliance and the Alliance ESOP in almost all legal matters.

239.    Squire Sanders owed Alliance and the Alliance ESOP a duty to use reasonable

care rendering the legal services provided to Alliance and the Alliance ESOP, including, but not

limited to:  giving legal advice that would allow the Alliance ESOP to be structured and

administered to comply with ERISA and other regulatory requirements; giving legal advice that

would allow Alliance to utilize an effective corporate governance structure; structuring corporate

transactions, including the spin-off of Alliance's interest in Trachte, in a manner that protected

Alliance's interests and complied with ERISA, and did not cause Alliance undue risk;

representing Alliance in connection with executive compensation decisions that would have

allowed Alliance to avoid paying Fenkell unreasonable compensation; representing Alliance in

connection with Fenkell's employment agreements that would protect Alliance against having to

pay Fenkell exorbitant compensation in the event of his termination; and representing the

Alliance Entities in the *Chesemore* litigation.

240.    But as detailed above, Squire Sanders breached that duty, including, but not

limited to, by:  allowing Alliance and the Alliance ESOP to continue to utilize a structure in

which Fenkell was the sole director of Alliance and the sole trustee of the Alliance ESOP, thus

facilitating Fenkell's breaches of his duties and violations of law; failing to look out for the

interests of Alliance and the ESOP in connection with the ESOP Structured Finance Program

while assisting with or at least ignoring Fenkell's and Stonehenge's misappropriation of the

participation interest earnings that rightly belonged to the ESOP/Alliance; effecting the Trachte

spin-off in a manner that violated ERISA and gave rise to the outcome in the *Chesemore* litigation; failing to protect Alliance and the Alliance ESOP in the *Chesemore* litigation; failing to protect the interests of Alliance and the ESOP in connection with the SLAMS/SLMRS/Hiram College transactions; and allowing Fenkell to anticipate developments related to his employment that caused Alliance to enter into agreements favorable to Fenkell, and not Alliance.

241. These breaches were a direct and proximate cause of injury to the Alliance Entities.

## COUNT THREE

### BREACH OF CONTRACT

242. Paragraphs 1 through 241 are incorporated as if set forth in full here.

243. Through its representation of Alliance and the Alliance ESOP, Squire Sanders and Alliance had an agreement that Squire Sanders would provide competent, loyal, and conflict-free legal services to Alliance and the Alliance ESOP, and would safeguard the interests of Alliance and the Alliance ESOP to the exclusion of all others' interests.

244. As detailed above, Squire Sanders breached that agreement, including by: representing interests adverse to Alliance and the Alliance ESOP; failing to obtain the requisite consent to represent interests adverse to Alliance and the Alliance ESOP; acting in concert with Fenkell and others to loot Alliance and the Alliance ESOP and deprive Alliance of corporate opportunities; using Alliance's and the Alliance ESOP's confidential information against it; and negligently providing legal advice and/or services to Alliance and the Alliance ESOP.

245. By contrast, Alliance and the Alliance ESOP performed under its agreement with Squire Sanders by paying Squire Sanders at least $7 million in legal fees over the life of the representation.

246. These breaches were a direct and proximate cause of injury to the Alliance Entities.

## COUNT FOUR

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

247. Paragraphs 1 through 246 are incorporated as if set forth in full here.

248. At all times relevant hereto, Fenkell owed Alliance and the Alliance ESOP fiduciary duties, including the duties to act exclusively in Alliance's and the Alliance ESOP's interest, to act with all loyalty to Alliance and the Alliance ESOP, to refrain from self-dealing, and to act with all due care in performing his duties.

249. Despite these mandates, Fenkell breached his fiduciary duty to Alliance and the Alliance ESOP by: causing Alliance to enter into the Stonehenge Contracts; participating for his own benefit in various Brookdale transactions; entering into the DBF Agreement and receiving kickbacks stemming therefrom; taking Alliance corporate opportunities for himself; causing himself to be paid excessive executive compensation; causing Alliance to enter into the SLMRS Agreement; and causing Alliance to enter into new employment agreements with him that inured to his benefit, and not Alliance's.

250. Squire Sanders and its attorneys knew of these breaches by Fenkell of his fiduciary duties to Alliance and the Alliance ESOP, and failed to advise Alliance and/or the Alliance ESOP of them.

251. Squire Sanders and its attorneys also encouraged and/or provided substantial assistance to Fenkell's breaches of his fiduciary duties to Alliance and the Alliance ESOP, including, but not limited to, by providing legal advice and/or services to Fenkell, DBF Consulting, Stonehenge and SLMRS; by failing to disclose Fenkell's total "compensation" to the Compensation Committee and otherwise providing cover for his actions in connection with his

Employment Agreement and the Amendment thereto; and facilitating Fenkell's cover-up and obfuscation of his actions through the tenure of his leadership of Alliance and the Alliance ESOP.

252.     These actions were a direct and proximate cause of injury to the Alliance Entities.

## COUNT FIVE

### FRAUD

253.     Paragraphs 1 through 252 are incorporated as if set forth in full here.

254.     Because of its relationship with Alliance and the Alliance ESOP, Squire Sanders owed Alliance and the Alliance ESOP a duty to speak truthfully to Alliance and the Alliance ESOP about material matters, and to avoid omitting material information.

255.     Despite this mandate, Squire Sanders made false statements to Alliance and the Alliance ESOP, and omitted other material information, at various times over the course of the parties' relationship, including, but not limited to:  the nature and extent of its relationship with Fenkell; Fenkell's undisclosed and self-serving agreements and thefts of corporate opportunities, including the DBF Agreement; Fenkell's siphoning off of Alliance assets to Stonehenge; Fenkell's excessive compensation; and the SLMRS Agreement and the relationship between SLMRS, SLAMS, Lianne Sefcovic, Draucker, and Hiram College.

256.     Alliance and the Alliance ESOP relied on these false statements, and Squire Sanders' omission of material information, to its detriment.

257.     These actions were a direct and proximate cause of injury to the Alliance Entities.

## COUNT SIX

### AIDING AND ABETTING FRAUD

258.     Paragraphs 1 through 257 are incorporated as if set forth in full here.

48

259.     Throughout the course of his employment by Alliance, Fenkell owed Alliance and the Alliance ESOP a duty to speak truthfully to Alliance and the Alliance ESOP about material matters, and to avoid omitting material information.

260.     Despite this mandate, Fenkell made false statements to Alliance and the Alliance ESOP, and omitted other material information, at various times over the course of his employment, including, but not limited to:  the nature and extent of his relationship with Squire Sanders and its attorneys, particularly Sefcovic and Draucker; secret compensation he obtained through DBF Consulting; opportunities he obtained for himself through DBF Consulting; the true nature of his siphoning off of Alliance assets to Stonehenge; that he was acting in Alliance's and the Alliance's ESOP's interests, when in fact he was acting in his own interests much of the time; and the existence and extent of his breaches of law and his breaches of fiduciary duties to Alliance and the Alliance ESOP.

261.     Squire Sanders knew of these misstatements and omissions by Fenkell, as evidenced by Squire Sanders' representation of Fenkell, Stonehenge, DBF Consulting, and SLMRS.

262.     Squire Sanders and its attorneys encouraged and/or provided substantial assistance to Fenkell's misrepresentations and omissions, and his breaches of his fiduciary duties to Alliance and the Alliance ESOP, including, but not limited to, by representing and otherwise giving legal advice to Fenkell, DBF Consulting, and SLMRS, and by concealing information regarding Fenkell and Squire Sanders' conduct.

263.     These breaches were a direct and proximate cause of injury to the Alliance Entities.

## COUNT SEVEN

### CIVIL CONSPIRACY

264.     Paragraphs 1 through 263 are incorporated as if set forth in full here.

265.     With a common purpose to extract from Alliance and/or the Alliance ESOP unjustified and/or illegal payments, Squire Sanders and its attorneys, Fenkell, DBF Consulting, and Stonehenge took at least one overt action that caused Alliance to enter into the Stonehenge Agreements, which caused Alliance to pay to Stonehenge fees, for which Alliance received no or minimal services in return.

266.     In the case of Squire Sanders and its attorneys, those actions included, but were not limited to, advising Stonehenge with respect to the Stonehenge Agreements.

267.     Those same persons took at least one overt act that caused DBF Consulting to enter into the DBF/Stonehenge Consulting Agreement, which caused DBF Consulting to siphon off a portion of the proceeds of the Stonehenge Agreements.

268.     In the case of Squire Sanders and its attorneys, those actions included, but were not limited to, advising Fenkell with respect to the DBF/Stonehenge Consulting Agreement.

269.     With a common purpose to extract from Alliance unjustified and/or illegal payments, Squire Sanders and its attorneys, Fenkell, SLMRS, SLAMS, and Lianne Sefcovic took at least one overt action that caused Alliance to enter into an agreement with SLMRS that required Alliance to pay SLMRS $27,500 a month for two years, totaling $660,000, for which AHI received no or minimal services in return.

270.     In the case of Squire Sanders and its attorneys, those actions included, but were not limited to, drafting and negotiating the SLMRS Agreement.

271.     The parties intended to cause these actions to occur, and intended to cause injury to the Alliance Entities.

272.   These breaches were a direct and proximate cause of injury to the Alliance

Entities.

## COUNT EIGHT

### KNOWING PARTICIPATION IN ERISA VIOLATIONS

273.   Paragraphs 1 through 272 are incorporated as if set forth in full here.

274.   As set forth above, Squire Sanders is an ERISA party in interest because it

provided legal services to ESOP. *See* § 3(14)(B), 29 U.S.C. § 1002(14)(B) (defining "party in

interest" as "a person providing services to [an employee benefit] plan"). Because (as set forth

herein) Squire Sanders partners knowingly participated in Fenkell's breaches of fiduciary duty,

Squire Sanders is also liable for Fenkell's breaches. *Harris Trust and Savings Bank, etc. v.*

*Salomon Smith Barney,* 530 U.S. 238 (2000), *National Security Systems v. Iola,* 700 F.3d 65 (3d

Cir. 2012), and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorize suits against fiduciaries

and non-fiduciary parties in interest who "knowing[ly] participat[e] in a fiduciary's violation" of

ERISA § 406.

275.   The misconduct of Fenkell described above constituted breaches of fiduciary duty

and prohibited transactions in violation of ERISA sections 404(a) and 406(a) and (b), including

but not limited to:  (1) Fenkell's agreement with Stonehenge to a purported services agreement

while he was a fiduciary to the ESOP and Stonehenge was a party in interest; (2) Fenkell's

agreement as ERISA trustee to pay Stonehenge extraordinary fees for purported advisory

services as a vehicle and cover for kickbacks paid to DBF Consulting; (3) Fenkell's orchestration

of the prohibited transactions and other ERISA violations as found by the Court in *Chesemore;*

(4) Fenkell's receipt of kickbacks in connection with the ESOP Structured Finance Program; (5)

Fenkell's acceptance of excessive compensation while hiding his illicit compensation from

Alliance Compensation Committee members; and (6) Fenkell's agreement to the Hiram College,

SLMRS, SLAMs scheme whereby he funneled ESOP and Alliance assets to Sefcovic and Lianne Sefcovic.

276.    As set forth herein, Squire Sanders through Sefcovic, Draucker and others knowingly participated in Fenkell's ERISA-prohibited transactions.

## COUNT NINE

### INDEPENDENT BREACHES OF ERISA FIDUCIARY DUTIES

277.    Paragraphs 1 through 276 are incorporated as if set forth in full here.

278.    As set forth above, Alliance did not become an operating company until mid-2011. Accordingly, before that date Alliance's assets were ESOP plan assets.

279.    Based on the misconduct described herein, Squire Sanders' dealings with Fenkell on Alliance matters through mid-2011 constituted dealing with plan assets, and Squire Sanders thereby breached the ERISA fiduciary duties imposed on it by ERISA Sections 404 and 406, 29 U.S.C. §§ 1104 and 1106.  With Fenkell, Squire Sanders exercised discretionary control or authority over ESOP plan assets and violated its fiduciary duties by serving the conflicting interests of its other clients when dealing with the Alliance ESOP.

## RELIEF SOUGHT

WHEREFORE, the Alliance Entities request the following relief:

A.    Actual compensatory damages, in an amount according to proof at trial.

B.    Punitive damages, in an amount according to proof at trial.

C.    Disgorgement of all legal fees paid to Squire Sanders by Alliance or any Alliance-affiliated entity (including, but not limited to, the Alliance ESOP) from 1995 through 2012.

D.   All equitable relief as authorized under ERISA Section 502(a)(3), including

surcharge and the full measure of joint and several relief to which Fenkell and

Stonehenge are subject for their prohibited transactions.

E.   To the extent the Court determines that Squire Sanders acted as an ERISA

fiduciary, the full measure of make-whole relief afforded by ERISA Section 409,

29 U.S.C § 1109, and co-fiduciary liability under ERISA section 405, 29 U.S.C. §

1105.

F.   Prejudgment interest.

G.   Costs and attorneys' fees, including under ERISA Section 502(g).

H.   Such other relief as the Court may deem appropriate.

### JURY DEMAND

Plaintiffs respectfully request a trial by jury on all issues triable by jury.

Dated:  October 10, 2014                           Respectfully submitted,

                                                   **BLANK ROME LLP**

                                                   LAURENCE S. SHTASEL (ID # 58528)
                                                   WILLIAM H. ROBERTS (ID # 16757)
                                                   JEREMY A. RIST (ID # 90806)

                                                   One Logan Square
                                                   130 North 18th Street
                                                   Philadelphia, PA  19103-6998
                                                   Tel:  215-569-5500
                                                   Fax:  215-569-5555
                                                   shtasel@blankrome.com
                                                   roberts@blankrome.com
                                                   rist@blankrome.com

                                                   *Attorneys for Plaintiffs*